**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO,** International Ladies' Garment Workers' Union, AFL-CIO, Northeast Department, and its Managing Agent, David Gingold, Local 111, International Ladies' Garment Workers' Union, AFL-CIO, and its Managing Agent, Sol Greene, Local 351, International Ladies' Garment Workers' Union, AFL-CIO, and its Managing Agent, Oscar Newman, Local 234, International Ladies' Garment Workers' Union, AFL-CIO, and its Managing Agent, Grace Birkel, Local 243, International Ladies' Garment Workers' Union, AFL-CIO, and its Managing Agent, Grace Birkel, and Local 109, International Ladies' Garment Workers' Union, AFL-CIO, and its Managing Agent, Harry Schindler, Respondents.

No. 12886.

United States Court of Appeals Third Circuit.

Argued Jan. 5, 1960.

Decided Feb. 4, 1960.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Jerome D. Fenton and Stuart

Rothman, Gen. Counsel, Thomas J. Mc-Dermott, Associate Gen. Counsel, Duane B. Beeson, Morton Namrow, Attys., N. L. R. B., Washington, D. C., for petitioner.

Morris P. Glushien, New York City (Sidney G. Handler, Harrisburg, Pa., Ruth Weyand, Washington, D. C., on the brief), for respondents.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This petition for enforcement of an order of the National Labor Relations Board (Board)[1] presents the unique question of whether a union and its agents violated Section 8(b) (3) and 8 (b) (1) (B) of the Labor Management Relations Act, 29 U.S.C.A. § 151 et seq., when they refused to meet and negotiate with a designated agent of the employers who had previously held responsible positions with the same union in the same territory.

The charging party in these cases, the Slate Belt Apparel Contractors' Association, Inc. (Association), is a Pennsylvania corporation which has as members approximately 100 employers who are engaged in performing certain sewing operations in the manufacture of blouses. The Association aims to improve the practices of people in the industry, to engage in collective bargaining with the union representing its employees, and also to handle negotiations with other trade associations in the industry. The International Ladies' Garment Workers' Union, AFL-CIO (ILGWU), its Northeast Department, and each of its locals which are respondents herein, are labor organizations admitting to membership employees of Association members. The Northeast Department of the ILGWU and the named locals are the collective bargaining representatives of the employees working for the Association members.

ILGWU had a policy, adhered to by the other respondents, of refraining from bargaining or negotiating with employers' representatives who had previously held union office. In the instant case they refused to have any dealings with Robert Mickus, the manager of the Association. Mickus had previously been employed from 1946 to 1956 by the ILGWU in various appointed posts within the Northeast Department. In January 1956 he resigned from his position with the ILGWU, and early in 1957 was employed by the Association to represent its members in dealings with manufacturers. Within six months he was appointed manager of the Association, with extensive responsibilities in the labor-management relations field. He was required to deal with the officials and agents of the respondent labor organizations concerning labor-relation matters of the Association and its member-employers. It is the refusal of the respondents to have any dealings with Mickus as the bargaining representative of the Association that is the basis for the charges in the instant case.

Following a hearing, the trial examiner found a violation by all the respondents except ILGWU of Section 8 (b) (3) of the Act, viz., a refusal to bargain. However, as regards the charge laid under Section 8(b) (1) (B) of the Act, viz., restraint or coercion of an employer in the choice of bargaining representative by a labor organization, the trial examiner found it had not been sustained. The Board affirmed the first recommendation in regard to Section 8(b) (3) and reversed the second, finding that "the Respondents engaged in and are engaging in restraint and coercion within the meaning of Section 8(b) (1) (B) of the Act."[2]

1. The Board's decision and order are reported at 122 N.L.R.B. No. 166.

2. Subsequent to the proceedings in the National Labor Relations Board, the Board filed its petition for enforcement in this court and at the same time applied to this court under Section 10(e) of the Labor Management Relations Act for an order restraining the strike which was then in progress. We refused to enjoin the strike, but on April 10, 1959, did issue an order *pendente lite* requiring

■ The general law on good-faith bargaining is quite clear. Section 8(b) (3) places upon unions the same obligation that Section 8(a) (5) of the Act places upon employers. Each party to the collective bargaining process has a right to choose, its representative, and there is a correlative duty on the opposite party to negotiate with the appointed agent.

However, this rule is not absolute or immutable. The General Counsel for the Board conceded in his brief that the rule applies "at least in the absence of unusual mitigating circumstances," and at oral argument he acknowledged that the "rule of reason" had to be applied. This fact is borne out by the cases, for in National Labor Relations Board v. Kentucky Utilities Co., 6 Cir., 1950, 182 F.2d 810, it was held that it was not an unfair labor practice for an employer to refuse to negotiate with a union representative who had evidenced hostility to it by his past activities. The court reasoned that

> "* * * With Braswell acting as one of the negotiators for the Union, any meeting with the negotiators would not have fulfilled the requirements of collective bargaining. His expressed hostility to the respondent and his purpose to destroy the respondent financially made any attempt at good faith collective bargaining a futility. *Just as collective bargaining in form only and lacking in substance has been condemned, certainly collective bargaining in form only without good faith negotiating on the other side should not be required.*" (Emphasis supplied.) 182 F.2d at page 813.

Likewise, the Board itself has recognized in Bausch & Lomb Optical Co., 108 N.L.

R.B. 1555 (1954), that there are occasions when the rights granted by Section 8(a) (5) and (1), although seemingly absolute, are subject to limitation. The Board considered there the limitations placed upon the right of employees to choose their representative and cited a number of its own opinions limiting that right. The employer was found not to have committed an unfair labor practice when it refused to negotiate with a union conducting a competitive business. The trial examiner had subscribed to the view that *there was no evidence of unfair advantage being taken by the union in the negotiations prior to their disruption.* Despite this, the Board concluded that the very existence of the dual relationship on the part of the union "created a situation which would drastically change the climate at the bargaining table from one where there would be reasoned discussion in a background of balanced bargaining relations upon which good-faith bargaining must rest *to one in which, at best, intensified distrust of the Union's motives would be engendered.*" (Emphasis supplied.) 108 N.L.R.B. at page 1561. Accordingly, the Board held that as long as the Union retained its dual status of bargaining agent and business competitor the employer's normal duty to bargain was suspended.

■ The instant case presents an analogous problem. The respondents contend that Mickus, during his lengthy tenure as an employee of the ILGWU, held highly confidential positions. The General Counsel asserts that this is a question of fact that the trial examiner and the Board found to be without merit and mere pretext. That finding is bottomed upon the conclusionary answers of Mickus [3] which amount to no more

---

compliance with the Board's order insofar as it directed bargaining with the Association through Robert Mickus or its other chosen representative. This action, of course, does not preclude consideration on the merits at this time.

3. On direct examination Mickus, after identifying himself, was asked only two questions:

"Q. You have heard testimony here about your employment with the union. During your service with the union, did you ever service any of the Slate Belt blouse shops? A. No, I did not.

"Q. While you were a member of the union, did you have access to any confidential information? A. No, I did not."

than a bald denial. However, his testimony on cross-examination belies the conclusionary answers. Some of the following facts were testified to by Mickus on cross-examination, and others were testified to by witnesses for the respondents and stand uncontradicted: For ten years Mickus served as an appointive official of the ILGWU in the very area where some employers who are members of the Association have their plants. Initially, he was employed as an organizer but later he became business agent for Local 111, which serves the territory in and about Allentown, Pennsylvania, and is the representative of the employees of some Association members. Mickus was next made assistant to Sol Greene who was "second in command" in the Northeast Department of the ILGWU (covering all the states in the northeast portion of the United States), the top official of the ILGWU in the state of Pennsylvania with the title of Director of Organization, and the manager of the Allentown District Council. This District Council was composed of ILGWU locals in the Allentown, Reading and Pottsville areas. During the absence of his superior, Mickus took over all of Greene's duties, including his duties with respect to employees of members of the Association. In general, Mickus was in the chain of command between the top officials of the ILGWU and the business agents of the locals who dealt with the members of the Association. Although there is a conflict in the testimony as to how many bargaining conferences and negotiation sessions he attended, Mickus himself testified to having attended a conference in Easton, Pennsylvania, in which there was a consideration of "whether there was going to be a strike with the Slate Belt Contractors." Mickus held the position of assistant to Sol Greene for a number of years and it was from that position that he resigned.

Under these circumstances the conclusion of the trial examiner, later adopted by the Board, that the reason given for the refusal to deal with Mickus was a pretext, is without basis in the record and must be disregarded. Upon the facts outlined above it is clear to us that Mickus held a highly confidential position in not only the same field, i. e., labor-management relations, but represented the union with whom he is now employed to negotiate. The Association now employs Mickus to perform the same functions for it as he performed for the union previously. In addition, the undisputed testimony is that the then manager of the Association told Greene that Mickus had been employed because of his years of familiarity from the inside of the union with its strategy, thinking, working, and operations. The announcement was made tauntingly and laughingly, in a manner indicating that he believed that the Association had "put one over on the union" and had "the union on the spot." This makes it abundantly clear that any collective bargaining done with Mickus would be "in form only without good faith negotiating on the other side." National Labor Relations Board v. Kentucky Utilities Co., 182 F. 2d at page 813. As the Board itself said in Bausch & Lomb Optical Co., 108 N.L. R.B. at page 1561, it would result in bargaining in which, "at best, intensified distrust of the Union's [Association's] motives would be engendered."

■ We conclude that the Association clearly displayed an absence of fair dealing, Phelps Dodge Copper Products Corp., 101 N.L.R.B. 360 (1952), in selecting and insisting upon Mickus as its bargaining representative, and thus that its offer to bargain was not made in good faith.

The petition for enforcement will be denied.

Judge McLAUGHLIN notes his concurrence in the result.

William Earl GARDNER, Appellant,

v.

UNITED STATES of America, and/or Fred T. Wilkinson, Warden, United States Penitentiary, Atlanta, Georgia, Appellees.

No. 18057.

United States Court of Appeals
Fifth Circuit.

Feb. 2, 1960.

William Earl Gardner, in pro. per., for appellant.

Charles D. Read, Jr., U. S. Atty., E. Ralph Ivey, Asst. U. S. Atty., Atlanta, Ga., for appellees.

Before RIVES, Chief Judge, and JONES and BROWN, Circuit Judges.

PER CURIAM.

The appellant, while serving a term of imprisonment under a state court conviction, was convicted of a federal offense in the United States District Court for the Eastern District of South Carolina, and by that court he was sentenced to imprisonment for a year "to begin at the completion of service of sentence now being served in the South Carolina penitentiary." While in the South Carolina penitentiary he twice attempted to escape and for so doing he was given two sentences of six months each to run consecutively. The appellant served his time for the sentence he was under when convicted in the federal court and also served the two sentences of six months which had been subsequently imposed. He was taken to the Federal Penitentiary at Atlanta, Georgia, to serve out the sentence imposed by the federal court. He contends that a year has expired since he finished serving the state court sentence he was under at the time of his federal conviction. Therefore, he says, the term of his federal sentence has expired and he is entitled to his freedom. This claim he undertook to vindicate by bringing a habeas corpus proceeding in the Northern District of Georgia. The district court dismissed the petition and this appeal is from the order of dismissal.

The district court was of the opinion that the relief claimed by the appellant could be obtained, if at all, only

by a proceeding under 28 U.S.C.A. § 2255. Habeas corpus was not an available remedy, so the district court believed, and dismissed the petition. We are not in agreement with this view. The appellant does not assert that there was any error in the proceeding which culminated in the sentence of the federal court in South Carolina. He does not attack the sentence or ask to be relieved of any part of it. His claim is, simply stated, that the term of his sentence has expired and his further detention is unlawful. If his legal premise that the term of his imprisonment has come to an end is sound, we are of the belief that his demand for release is properly asserted in a habeas corpus proceeding.

Section 2255 is applicable in those cases where a prisoner in custody under the sentence of a federal court claims the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose the sentence, or that the sentence was excessive, or is otherwise subject to collateral attack. The appellant makes none of these claims. He makes no attack on his sentence but, accepting it, asserts that it has been served.

On the merits of the appellant's claim he must fail. The sentence given the appellant in the federal court is in the same form as that which this Court reviewed in Harrell v. Shuttleworth, 5 Cir., 1952, 200 F.2d 490. There the same contention was made in a habeas corpus proceeding as is here being made. There it was held that no method of computing the term could be prescribed other than is fixed by the statutory provision of 18 U.S.C.A. § 3568 that "The sentence of imprisonment of any person convicted of an offense in a court of the United States shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for the service of said sentence." See also McIntosh v. Looney, 10 Cir., 1957, 249 F.2d 62, where Harrell v. Shuttleworth, supra, is cited with approval.

Although not in agreement with the correctness of the district court's ground for the dismissal of the appellant's petition, we do agree that, for another reason, the petition was properly dismissed. It follows that the judgment of the district court is

Affirmed.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DAN RIVER MILLS, INCORPORATED,
Alabama Division, Respondent.

No. 17693.

United States Court of Appeals
Fifth Circuit.

Jan. 26, 1960.

Fred S. Landess, Atty., Thomas J. Mc-Dermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Fannie M. Boyls, Atty., N. L. R. B., Washington, D. C., for petitioner.

Frank A. Constangy, Constangy & Prowell, M. A. Prowell, Mildred McClelland, Atlanta, Ga., for respondent.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board seeks enforcement of its decision and order, 121 N. L. R. B. 82, holding that the Employer had violated § 8 (a) (1) by unlawful interference with protected rights, § 8(a) (3) by discriminatory discharge of five employees for union activities and § 8(a) (5) by bad faith refusal to recognize the union as bargaining agent in the Aliceville, Alabama mill. 29 U.S.C.A. § 158(a) (1), (3) & (5). We enforce in part.

The organizational activity at the Aliceville, Alabama mill began in early December 1956 and the events we deal with run into June 1957. The first union organizational meeting was held December 11, 1956, and on the following day two of the discharges here involved were made. By December 16 the Union claimed to have obtained authorization cards from a majority of the employees, and on that date, or a few days thereafter, notified the Employer and requested recognition. An election, originally ordered pursuant to representation proceedings and hearing, was never held as the Board

dismissed the petition because of the Union's amended charge and the Board complaint made thereon asserting a § 8 (a) (5) unfair labor practice for refusing to recognize the Union.

### § 8(a) (1) Violation.

■ Little need be said about the Board's decision and the evidence on this score. The Employer does not concede the validity of the charge. Indeed, it asserts that the findings are strained and ought not to have been made. But it does expressly acknowledge with a candid and lawyer-like intellectual realism that takes into account the vivid delineation of responsibility between the Board and a reviewing court, N. L. R. B. v. Ferguson, 5 Cir., 1959, 257 F.2d 88, that on this phase the evidence was sharply conflicting and afforded the basis for contrary inferences by the fact finder.

This evidence which we need not detail amply justified the subsidiary conclusions adding up to unlawful interference. These included coercive interrogation of employees concerning union views and activity, threats to shut down the mill if the mill were organized, threats to discharge employees because of their union views and actions, surveillance of a Union meeting and the requirement that a discharged employee forsake union views as a condition to reemployment.

### The § 8(a) (3) Discharges.

■ Of course, the violation of § 8(a) (1) does not bring all discharges made during its pendency within § 8(a) (3). N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 410. A discharge becomes forbidden only if motivated by an unlawful purpose to discriminate against the Union or its adherents. A general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose. It must be established with respect to each discharge. But antiunion bias and demonstrated unlawful hostility are proper and highly significant factors for Board evaluation in determining motive. N. L. R. B. v. WTVJ, Inc., 5 Cir., 1959, 268 F.2d 346; Smith Transfer Co. v. N. L. R. B., 5 Cir., 1953, 204 F.2d 738, 739–740.

■ We have no doubt as to the Employee James A. Clark. He was discharged the day following the first organizational meeting. The evidence was such that it did not compel acceptance of the Employer's contentions that Clark was discharged because he solicited union authorization cards from fellow employees contrary to a no-solicitation rule and under circumstances interfering with essential work. There was great doubt about existence of any such rule and its prior publication or posting, and whatever doubts arose from pre-discharge actions were dispelled by post-discharge efforts for reinstatement. The Employer by words which, if credited as stated, reflected their own motivation, N. L. R. B. v. Ferguson, supra, adequately demonstrated that Clark's discharge came from his union interest.

■ Nor do we as to James Elton Gibson and Berley L. Howard. Gibson was the target of much employer § 8(a) (1) coercive conduct. When he withstood this pressure and openly asserted that the Union was not going to be driven off, the plant superintendent charged that his overseer had reported that his production was low. The overseer denied making any such report and an analysis of the so-called "write-ups" on performance deficiencies were open to considerable question. True, two such events, absence from work because of illness and failure to clean air vents on February 5, were recited with substantial correctness. But there was sufficient basis, including credited testimony that Phillips, the overseer, never complained about failure to clean the air vents, to justify the inference that, even though accurate, these reasons given on the hearing were a pretext for the discharge. Mrs. Howard was likewise the target of Phillips' threatening predictions. Despite ten years of service her work then became the frequent subject of criticism by the two overseers, neither of whose testi-

mony was credited and was almost invariably rejected by the trier. The "write-ups" as to her were also dubious both from intrinsic ambiguities and a sharp conflict on the underlying facts constituting the incidents.

■ The matter is much more uncertain as to Wilton Russell Bryant and George Newman. On objective facts all that seems to uphold the Board's decision as to Bryant is the fact that as would any respectable father, he acknowledged that his son, Sonny Bryant, was a good union man, the head of a union in a nearby electrical plant and one of those extremely active in setting up and conducting the first organizational meeting the night before. His discharge followed a few hours later. Offsetting this was evidence showing that reduction in maintenance work which Bryant was hired to do now required but one man, and the Employer picked the other (Montgomery) on the basis of comparative experience and efficiency. But the evidence does not end there, nor did the incident of his discharge. When he returned the next day to get his paycheck, he asked the plant superintendent if it was not a fact that he had been fired because of his own or his son's union activities. To this the plant superintendent replied, "Well, if that's the way you want it, that's all right with me. I want it to be a lesson to the rest of the employees." Thus it was a case of " * * * words attributed to those authorized to speak for management" which, we pointed out in N. L. R. B. v. Ferguson, supra, if they "are credited as having been said, their form and content and context eliminate all doubt on motive."

■ But as to George Newman, there is neither objective evidence nor credited expressions of incriminating motive. He was, to be sure, like others a target of § 8(a) (1) pressures. But his discharge was quite different. During the week prior to February 5, he was told by his overseer that a drawhand frame operator would take his job under a share-the-work program about which

there seems to be no question. Newman's only concern was why a drawhand frame operator, rather than another classification, would be selected. Subsequently the plant superintendent called Newman in and said he understood Newman did not know why he was off during the preceding week. The plant superintendent then said, "Well, George, because you don't understand, I am going to lay you off and call it no work available."

That statement, on its face, is susceptible of many meanings, some permissible, some unlawful. Its variables are not reduced by reading prior § 8(a) (1) utterances into this episode. The threat implicit in the plant superintendent's question earlier made to Newman as to what Newman thought the Union could get him "besides fired or [his] job" is not sufficient. Nor was it aided by the superintendent's answer to Newman's earlier assertion that the plant would not really close as the divisional superintendent had publicly stated to the assembled employees would be the case if it were organized. To that the plant superintendent replied that they would just have to wait and see, but Newman should reconsider the matter. When Newman then asked if he was being fired, the plant superintendent replied, "No, there is plenty of time if that was necessary."

The bias and coercive threats were fully established, but except for union membership nothing else was proved save these equivocal conversational exchanges to show that this employee's discharge came from a purpose to discriminate. This unlawful motive "is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one." N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F. 2d 406, 413. This record, with all of its uncertainties, does not meet the standard set forth with logical clarity in N. L. R. B. v. Fox Mfg. Co., 5 Cir., 1956, 238 F.2d 211, 214, 215, amplifying the principles discussed in N. L. R. B. v. Coats

& Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 572, modifying the rule of N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848, 854. See also N. L. R. B. v. West Point Mfg. Co., 5 Cir., 1957, 245 F.2d 783, 786; N. L. R. B. v. Birmingham Pub. Co., 5 Cir., 1959, 262 F.2d 2.

The § 8(a)(5) Refusal to Recognize.

The Employer categorically declined to recognize or bargain with the Union on the forthright, albeit risky, ground that the Union did not represent an uncoerced majority of the employees. Alleviating the calculated risk in that bolder course were the Board's nose-count finally to go against it, the Employer had a second line of defense. This was that even though there was an actual numerical majority, the Employer's refusal to recognize was motivated by a good faith doubt.

 Cutting a big figure in that defense was the Union's first seeking, later withdrawing, the Board first ordering, later dismissing, a representation proceeding for a Board-conducted election. On the hearing before the Examiner, before the Board and now here, all have been principally preoccupied with the first issue—the numerical count. We briefly discuss this only in passing as we think that the subsidiary defense of good faith was established. Despite this, considering the substantial size of the employee population involved, it is still worthy of some mention as it dramatizes just how close the count really was. Of course, a majority is a majority, and a majority of one, as in political affairs, is as potent as unanimity. But the more narrow the margin of victory, the more complex or unclear the ground for sustaining or rejecting challenges to given ballots counted or not counted, the more basis will there generally be that the doubt as to a majority, though finally unfounded, was at least maintained in the best of considered good faith.

It was finally stipulated that there were 332 employees in the bargaining unit. This required a minimum of 167 authorization cards. At the hearing, the General Counsel presented 188 cards. After rejection of some by the Trial Examiner and the Board and withdrawal of others by the General Counsel, the Board found that 172 were valid. It may be, as now contended, that the figure should have been 176 because of inadvertent arithmetical errors. The Employer, starting with the 188 cards, deducting those for persons not in the unit, not on the agreed payroll, rejected by the Trial Examiner and 6 rejected by the Board, came out with a count of 167—a bare majority of one, not 5 as found, or 9 as now urged. And having reduced it to this narrow margin, the Employer then urged that a great number of cards should have been rejected because they were, at most, intended by their signers as an authorization for an election, but not representation in the absence of an election certification.

But there was much more than this razor thin majority to justify the Employer's doubt. This was the action of Union and Board in connection with the very problem of majority representation. The Union, by letter dated December 16, but probably sent a day or so later, demanded that the Employer recognize the Union and commence bargaining with the named committee. The letter stated that "If there is any question about the majority having designated this Union as their agent for collective bargaining purposes, we are prepared to promptly prove same either by a check of cards before a mutually agreeable impartial person, or in an immediate secret election by the National Labor Relations Board, or some other acceptable agency." But before the Employer could even reply, and most likely before the Employer ever got the letter dated and supposedly sent December 16 (a Sunday), the Union filed a formal petition for a representation proceeding with the Board on Monday, December 17. The Board's regional office advised the Employer of this about December 18–19. The Employer advised the Board, as it did the Union by letter on December 21, that it doubted the ma-

jority status and would therefore decline to grant recognition or commence bargaining.

The Board treated it as a bona fide controversy and held a formal hearing on the representation petition on January 17, 1957. At the hearing, question was raised not only as to majority representation, but as to the appropriate unit. The Board held the matter under consideration until its order of February 28, 1957. This directed an election. That order also determined that the watchmen and guards, included in the Union's initial request, were excluded. The election ordered was never held.

Again, it was not action of the Employer, but rather that of the Union and the Board, which resulted in that election not being held. For while the representation petition was pending and before the order of election February 28, 1957, was issued, the Union filed charges of unfair labor practices on February 20, 1957. These charges were for the § 8(a) (1) and § 8(a) (3) violations discussed above. It was not until the second amended charge filed March 13, 1957, that the first charge of any kind was asserted for refusal to bargain "since on or about 12/16/56 when demand was made" on the Employer by the letter of December 16, 1956. With the order for election still outstanding, the Regional Director issued the complaint of May 29, 1957, on which the order under review was based. On June 5, 1957, the Board dismissed the representation petition by granting the Union's undisclosed motion of March 13, 1957, for withdrawal.

 Our decision is not a criticism of the Board for the dismissal, as such, of the representation proceeding. There is a certain logical consistency to its position. The charge and complaint in essence claim that the Employer is guilty of an unfair labor practice because it refuses to recognize a union having a majority status. A representation proceeding, on the other hand, is premised on the express interim conclusion that there is a doubt as to majority representation. Both proceedings ought not to be maintained simultaneously since, as the Board held here, "a representation proceeding and an unfair labor practice proceeding alleging refusal to bargain are mutually inconsistent." 121 N.L.R.B. 82, at ——. Nor, as the prior decisions of this and other courts attest, does the filing or simultaneous pendency of such a proceeding afford an automatic insulation exonerating the employer against actions which amount to unfair labor practices. See N. L. R. B. v. Southeastern Rubber Mfg. Co., 5 Cir., 1954, 213 F.2d 11, 15; N. L. R. B. v. Stewart, 5 Cir., 1953, 207 F.2d 8, 11–12; N. L. R. B. v. Armco Drainage & Metal Products, Inc., 6 Cir., 1955, 220 F.2d 573, 576–577, certiorari denied 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748; Franks Bros. Co. v. N. L. R. B., 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020.

On the other hand, the filing and pendency of the representation proceeding cannot be ignored altogether as the Board has here done. Its significance in a § 8 (a) (5) refusal to bargain charge is not confined to the narrow, unique situation of Aiello Dairy Farms, 110 N.L.R.B. 1368. The machinery of the Board is to vindicate public, not private, rights, N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243, and where the situation reasonably calls for an impartial determination of a serious controversy, it is reasonable for an employer to expect that official processes once invoked may be used for its resolution.

No one could contend that from the very outset there was not a real controversy. That controversy centered around the cards held on December 16 for the Union claimed and the Board found that all cards counted were signed on or before that date. That date was critical for this case does not involve a change, plus or minus, thereafter. The Union from December 16 on claimed a majority. The Employer immediately and continuously disputed this. Neither won a resounding victory, and the final result was both narrow and late in coming. In the meantime what was this Employer—

holding this genuine doubt which nearly turned out to be an actuality—to do? Did the price of good faith mean that he must capitulate? If he · was entitled to an opportunity to consider and evaluate it, how long was he given?

■ Surely he did not have to answer on December 17. An answer by December 21 would be timely. Since before the letter could even be acknowledged the Union had already filed the representation petition, was it evidence of the Employer's bad faith when he declined, as the Union's letter alternatively suggested, to make a card count through some unidentified impartial person? To the contrary, was it not perfectly reasonable that the Employer would accept the other alternative specified—a Board election—machinery for which the Union had already set in motion? Was it not reasonable that he at least defer affirmative action pending determination whether the Board would accept the representation petition? Once the hearing on that petition was held on January 17, 1957, was it not reasonable that he await the decision? And once the decision was made and the election ordered on February 28, 1957, was it not utterly reasonable that he abide that order? In the light of these events was it not reasonable that he thought the Board's action put the imprimatur of law upon the existence of doubt since the statutory basis for the Board's action requires the existence of a question. It requires first an investigation and hearing to determine whether there is "reasonable cause to believe that a question of representation * * * exists." And as a condition to ordering an election, the Board must thereafter specifically find "upon the record of such hearing that such a question of representation exists." 29 U.S.C.A. § 159(c) (1) (B).

And were these actions not reasonable as supposed, what was he to do? How was he to go about it? What tools could he use? He might have requested to see the authorization cards. But that would not have been enough. The Union had already indicated it would not trust the count or validity of the cards to the Employer. This was to be by a "mutually agreeable impartial person." Assuming that despite its unilateral choice of the alternative of a Board proceeding, the Union would have still agreed to this method and an impartial person had been chosen, even this might have proved to be insufficient. For it was the Employer's contention—then and since—that a great number of these cards did not represent the voluntary wishes of such employees.

■ How was this critical fact to be determined? True, an employer does have the legal right to interrogate to find out. Parks v. Atlanta Printing Pressmen and Assistant's Union No. 8, 5 Cir., 1957, 243 F.2d 284, 288, especially at note 7, certiorari denied 354 U.S. 937, 77 S.Ct. 1397, 1 L.Ed.2d 1537, on rehearing 5 Cir., 248 F.2d 386. But like Odysseus, he stands almost helpless as he makes the perilous passage between Scylla and Charybdis. If he makes a simple inquiry of each employee and accepts the simple answer, the very pressures apprehended may well bring about the employee's confirmation as well. If he probes deeper, the inquiry unavoidably becomes an investigation and soon it is inescapable that there be insinuations or intimations in terms of relative evaluation of union or nonunion conditions. At that point, undefined and undefinable, the inquisitor trespasses either on forbidden ground or flounders in the Serbonian bog, Landress v. Phoenix Mut. L. Ins. Co., 1934, 291 U.S. 491, 499, 54 S. Ct. 461, 463, 78 L.Ed. 934, 938, surrounding it so that what started out to be a means of compliance with law is turned into an affirmative charge of an unfair labor practice. And all the while, all that is done, all that is said, all that is asked, all that is answered, rests in the uncertain recollection of the partisan participants. What begins as the employer's quest now ends in the employer's flight. And now no longer will his conduct be judged alone by what was said. Now, through the unavoidable nature of our legal administrative machinery, N. L.

R. B. v. Ferguson, supra, it will be judged by what interested partisans say one said was said, or what others said to have said say was said.

As we have pointed out in Parks v. Atlanta Printing Pressmen and Assistant's Union, No. 8, supra, and Cone Bros. Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, 42, self-help under these circumstances is tortuous and fraught with danger. Substituting partisan determination of controversies through the means of volcanic pressures of an industrial conflict for that of impartial disinterested governmental machinery ought not to be encouraged.

Under the special circumstances of this case, it was reasonable for the Employer to assume that the law would resolve its good faith doubt concerning the Union's majority by the election requested and shortly ordered. The subsequent dismissal of those proceedings with the filing of the unfair labor complaint cannot deprive its interim actions of that cloak of reasonableness and good faith doubt. The order as to § 8(a) (5) may not, therefore, stand.

Enforced in part and denied in part.

**Rex L. NEELY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16418.**

United States Court of Appeals
Ninth Circuit.

Jan. 20, 1960.

Whitney & LaPrade, Louis B. Whitney, Loretta Whitney, Paul W. LaPrade, Phoenix, Ariz., for appellant.

Jack D. H. Hays, U. S. Atty., William A. Holohan, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before POPE, MAGRUDER and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Appellant, Rex L. Neely, and Joe L. Short were charged in a twelve-count indictment filed in the United States District Court for the District of Arizona

with violating 18 U.S.C. §§ 201, 202, 2073 and 371. At all times relevant, appellant Neely was a farmer engaged in raising cotton, and Short was the office manager of the Pinal County (Arizona) Agricultural Stabilization and Conservation Committee (called the ASC Committee) and in such capacity charged with the duty of proper administration of the cotton acreage allotment and marketing quota program of the United States.

In Counts 1, 3 and 5, appellant was charged with tendering bribes to Short, with intent to influence Short to act in his official capacity and allow the commission of a fraud against the United States, to-wit, the procuring of a cotton allotment for appellant in excess of that to which appellant was lawfully entitled under the cotton acreage allotment and marketing quota program of the United States (18 U.S.C. § 201).[1]

In Counts 2, 4 and 6, Short was charged with accepting the alleged bribes charged to have been tendered in Counts 1, 3 and 5 (18 U.S.C. § 202).

In Counts 7 through 11, Short was charged with making false and fictitious entries in records relating to his duties, and appellant was charged with aiding, abetting and inducing Short to commit said acts (18 U.S.C. § 2073).

In Count 12, Short and appellant were charged with conspiracy to defraud the United States in the exercise of its governmental function of administering the cotton acreage allotment and marketing quota program free from bribery, improper influence, dishonesty, unlawful impairment, fraud and corruption (18 U.S.C. § 371).

Short was convicted by a jury on all counts in which he was charged except Count 12, the conspiracy count. Appellant Neely was convicted on Count 5, but acquitted upon all other counts in which he was charged. Appellant's motions for dismissal of the indictment, in arrest of judgment, and for a new trial were denied, and he was sentenced to pay a fine of $1,000. Notice of appeal was timely filed by appellant. (There was no appeal by Short.)

The District Court had jurisdiction under Title 18 U.S.C. § 3231 and this Court has jurisdiction under 28 U.S.C. § 1291.

Count 5 of the indictment, upon which appellant was convicted, charged that appellant, knowing Short's official capacity, did, on or about December 9, 1955, willfully and unlawfully tender a bribe to Short in the form of a check in the sum of $1750, payable to Short, with the intent to influence Short to act in his official capacity in committing and allowing the commission of a fraud against the United States, to-wit, the procuring of a cotton allotment for appellant in excess of that to which the appellant was lawfully entitled under the cotton acreage allotment and marketing quota program of the United States.

Count 1 charged that appellant, on April 5, 1954, tendered Short a check in the sum of $1620, and Count 3 charged that appellant, on November 22, 1954,

1. 18 U.S.C. § 201 provides:

"Whoever promises, offers, or gives any money or thing of value, or makes or tenders any check, order, contract, undertaking, obligation, gratuity, or security for the payment of money or for the delivery or conveyance of anything of value, to any officer or employee or person acting for or on behalf of the United States, or any department or agency thereof, in any official function, under or by authority of any such department or agency or to any officer or person acting for or on behalf of either House of Congress, or of any committee of either House, or both Houses thereof, with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, or with intent to influence him to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be fined not more than three times the amount of such money or value of such thing or imprisoned not more than three years, or both. * * *"

"Before a farmer could sell his cotton, he had to obtain from the ASC committee a marketing card. To be eligible for a marketing card, the farmer must have finally been measured as planted within his allotment or have paid the penalty on the excess (7 CFR 722.757 and 722.-765).